PROSKAUER ROSE LLP
Neil H. Abramson (NA-0889)
Joshua F. Alloy (JA-4372)
1585 Broadway
New York, New York 10036
(212) 969-3000
*Attorneys for Defendants*
*The New York Times Co. and*
*City & Suburban Delivery Systems*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| STEVE S. LAM and SAMMY JACKSON, | : | 09 Civ. 5700 (BSJ) (GWG) |
| | : | |
| Plaintiffs, | : | **ECF CASE** |
| | : | |
| -against- | : | |
| | : | |
| THE NEW YORK TIMES COMPANY, CITY AND SUBURBAN DELIVERY SYSTEMS, INC. and THE NEWSPAPER AND MAIL DELIVERERS UNION, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW IN SUPPORT OF THE NEW YORK TIMES' AND CITY &
SUBURBAN DELIVERY SYSTEMS' MOTION TO DISMISS THE COMPLAINT**

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Defendants The New York Times Company ("The Times") and City & Suburban Delivery Systems, Inc. ("C&S) in support of their Motion to Dismiss the Complaint of Plaintiffs Steve S. Lam ("Lam") and Sammy Jackson ("Jackson") pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiffs Lam and Jackson, both former employees of Defendant C&S, initiated this action in the Supreme Court of New York, County of New York, alleging state common law breach of contract and fraud claims arising out of (i) an employee welfare benefit plan established under the Employee Retirement Income Security Act ("ERISA") and/or (ii) a collectively-bargained agreement entered into between C&S, The Times, and the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU") in connection with the permanent closing of C&S (the "Closing Agreement").

Specifically, Lam and Jackson dispute the amount of severance pay to which they are entitled pursuant to the City & Suburban Delivery Systems, Inc. January 2009 Severance Pay Plan For Eligible Employees Represented by the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "Severance Plan") and allege that The Times, C&S, and the NMDU engaged in fraud in connection with its announcement of several severance options pursuant to the Closing Agreement and the Severance Plan.

On June 22, 2009, the action was removed to this Court pursuant to 28 U.S.C. § 1441(b) because Plaintiffs' claims seek severance benefits and damages pursuant to and related to an employee welfare benefit plan and are therefore preempted by and controlled by ERISA, and because Plaintiffs' claims are also substantially dependent upon analysis of the terms of an agreement made between parties to a collective-bargaining agreement and are therefore further

1

preempted and governed by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

The Times and C&S now move to dismiss the action on five independent grounds.

First, Plaintiffs' claims for breach of contract and fraud are completely preempted by ERISA, which provides the exclusive remedy for claims for benefits under an ERISA plan.

Second, even if Plaintiffs' state law claims were properly re-pled as claims under ERISA, they would still fail as a matter of law because Plaintiffs failed to exhaust their administrative remedies as required under the Severance Plan.

Third, because Plaintiffs' claims for breach of contract and fraud require interpretation of the collectively-bargained Closing Agreement and collectively-bargained side letter agreements, they are additionally preempted by Section 301 of the LMRA.

Fourth, even if Plaintiffs' claims were properly re-pled to state a cause of action under Section 301, they would still fail as a matter of law because Plaintiffs failed to exhaust the exclusive grievance and arbitration process set forth in the Closing Agreement and have not alleged that the NMDU breached its duty of fair representation by preventing exhaustion of their claims.

Fifth, even if it is not preempted by ERISA and/or the LMRA, Plaintiffs' state law claim for fraud independently fails as a matter of law because Plaintiffs have already waived and released all claims concerning their election to participate in the Severance Plan, and because Plaintiffs have not pled any of the specific facts and circumstances allegedly constituting the fraud so as to meet the heightened pleading requirement set forth in Rule 9 of the Fed. R. Civ. P.

For each of these reasons, the action must be dismissed.

## STATEMENT OF FACTS[1]

Through a variety of subsidiary and affiliated companies, The Times publishes and distributes many different newspapers throughout the country and around the world, including *The New York Times*, as well as online versions of its various print publications and other digital content. *See http://www.nytco.com/company/index.html.*

On December 10, 2008, C&S, a wholly owned subsidiary of The Times, sent a letter to all "Regular Situation Holders" ("RSH's") represented by the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "NMDU" or "Union"), including both Plaintiffs, confirming the closure of C&S on January 4, 2009 and the elimination of their positions as of that date.[2] Complaint ¶ 5. As the letter noted, C&S, The Times, and the NMDU had negotiated and then entered into a "Closing Agreement" (including several side letter agreements) which, *inter alia*, provided all NMDU-represented RSH's with a number of post-separation options depending on their seniority.[3] Alloy Aff., Ex. 1 at 1. The Closing Agreement also required that the specific terms of the buyout and severance programs be set forth in separate documents to be distributed to all eligible individuals. Alloy Aff. Ex. 2 at 5-6.

In accordance with the Closing Agreement, the December 10, 2008 letter explained that C&S was offering RSH's the opportunity to participate in the City & Suburban Delivery Systems, Inc. January 2009 Severance Pay Plan For Eligible Employees Represented by the

---

[1] The facts described herein are either included in the Complaint or based on documents referenced in the Complaint. Under the incorporation rule followed within the Second Circuit, documents attached to and/or referenced in a complaint may be referred to and relied upon in a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6). Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

[2] A true and correct copy of a blank December 10, 2008 letter sent to all RSH's – referenced in Paragraph 5 of the Complaint – is annexed as Exhibit 1 to the Affidavit of Joshua F. Alloy ("Alloy Aff.") in support of this Motion.

[3] A true and correct copy of the Closing Agreement (and side letter agreements) – which is referenced in the December 10, 2008 Letter – is annexed as Exhibit 2 to the Alloy Aff.

3

Newspaper and Mail Deliverers' Union of New York and Vicinity (the "Severance Plan") and to receive a severance package in exchange for signing a Separation Agreement and General Release (the "Release Agreement").[4] Alloy Aff., Ex. 1 at 1.

Specifically, the letter outlined the various options available to employees and instructed them to carefully review the Severance Plan (which contained the full terms and conditions of the program) and to sign and return an Election Form and Release Agreement(s) if they decided to participate in the Severance Plan.[5] Id. at 1-4. The Severance Plan, as mandated by the collectively-bargained Closing Agreement, provided RSHs with four options.

First, pursuant to Paragraph 2 of the Closing Agreement, The Times agreed to make available at The Times positions for the sixty-five (65) most senior, eligible (as defined in the Closing Agreement) RSH's who elected to accept such a position. Id. at 4. In accordance with the Closing Agreement, RSH's were offered the opportunity to become employed with The Times "in seniority order." Id. Employees who became employed with The Times could not participate in the Severance Plan and were not eligible to receive any payments or benefits under the Severance Plan. Id.

Second, employees could elect what was called the "Buyout Option." Id. at 2. To be eligible for this option, an employee's name must have been listed on Appendix A of the Severance Plan, and he or she must have been one of the first one-hundred forty (140) most senior employees (who had not obtained employment with The Times pursuant to the first option) to select the Buyout Option. Id. at 2. The Buyout Option provided eligible employees

---

[4] A true and correct copy of the Severance Plan – which is referenced in Paragraph 7 of the Complaint – is annexed as Exhibit 3 to the Alloy Aff. Two separate Release Agreements were attached as exhibits to the December 10, 2008 letter (Ex. 1 to the Alloy Aff.).

[5] A true and correct copy of a blank Election Form – which is referenced in Paragraph 6 of the Complaint – is annexed as Exhibit 4 to the Alloy Aff.

4

with a one-time lump sum severance payment of $100,000 (minus applicable taxes and withholdings), as well as the continuation of certain contributions to the NMDU Health and Welfare Fund. Id. Employees choosing the Buyout Option also were required to execute and not revoke the Release Agreement attached as Exhibit A to the letter. Id.

Third, employees could elect what was called the "Basic Severance Option," which provided eligible employees with a lump sum payment of eight (8) weeks of Base Pay (as defined in the Severance Plan) (less applicable taxes and withholdings) and certain contributions to the Welfare Fund. Id. at 3. Employees choosing the Basic Severance Option were required to execute and not revoke the Release Agreement attached as Exhibit B to the letter. Id. Employees who selected the Buyout Option could also select the "Basic Severance Option" as an alternative in the event they did not qualify for the Buyout Option. Id. at 2. Employees who preferred the Buyout Option but would also accept the Basic Severance Option in the event they did not qualify for the Buyout Option were required to sign both Release Agreements. Id. at 4.

Fourth, employees could decide not to select any of the options described above, in which case they did not need to execute either of the Release Agreements. Id.

Employees were given until January 26, 2009 to choose one of the available options and return a completed Election Form. Alloy Aff., Ex. 4 at 1. Employees who chose the Buyout Option and/or the Basic Severance Option were also required to sign and return the appropriate Release Agreement(s) between January 4, 2009 and January 26, 2009. Id. at 1-3. Employees had seven (7) days to revoke their decision following the execution of the Release Agreement(s). Id. at 2.

On December 30, 2008, Plaintiff Steve Lam completed and signed his Election Form, choosing to participate in the Severance Plan and electing the Buyout Option and the Basic

5

Severance Option as an alternative in the event he was not eligible for the Buyout Option.[6] Complaint ¶ 11. Lam timely signed and returned Release Agreements for both the Buyout Option and the Basic Severance Option.[7] Complaint ¶ 11.

On January 12, 2009, Plaintiff Sammy Jackson completed and signed his Election Form.[8] Complaint ¶ 11. Although Jackson initially selected <u>only</u> the Buyout Option, he subsequently changed his mind and elected both the Buyout Option and the Basic Severance Option as an alternative in the event he was not eligible for the Buyout Option. Alloy Aff., Ex. 7. Jackson also timely signed and returned both of the Release Agreements.[9] Complaint ¶ 11.

On or about March 4, 2009, Plaintiffs Lam and Jackson each received a lump sum payment under the Severance Plan representing eight (8) weeks of Base Pay in accordance with the Basic Severance Option.[10] Complaint ¶ 12. Because Plaintiffs were not among the 140 most senior employees to choose the Buyout Option, they were deemed ineligible for the Buyout Option and instead received the Basic Severance Option pursuant to their elections. Complaint ¶ 14.

On or about June 2, 2009, The Times was served with the Complaint in this action seeking benefits under the Severance Plan and other damages. A copy was mailed to the former

---

[6] A true and correct copy of Plaintiff Steve Lam's Election Form – referenced in Paragraph 11 of the Complaint – is annexed as Exhibit 5 to the Alloy Aff.

[7] True and correct copies of the two Release Agreements signed by Lam – referenced in Paragraph 11 of the Complaint – are annexed as Exhibit 6 to the Alloy Aff.

[8] A true and correct copy of Plaintiff Sammy Jackson's Election Form – referenced in Paragraph 11 of the Complaint – is annexed as Exhibit 7 to the Alloy Aff.

[9] True and correct copies of the two Release Agreements signed by Jackson – referenced in Paragraph 11 of the Complaint – are annexed as Exhibit 8 to the Alloy Aff.

[10] A true and correct copy of the payments provided to Plaintiffs Lam and Jackson under the Severance Plan – referenced in Paragraph 12 of the Complaint – are annexed as Exhibits 9 and 10 to the Alloy Aff.

address of C&S. On June 22, 2009, this case was timely removed to this Court pursuant to 28 U.S.C. § 1441(b).

## ARGUMENT

### I.

### PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT AND FRAUD ARE PREEMPTED BY, AND FAIL TO STATE A CLAIM UNDER, ERISA

**A.     Plaintiffs' Claims Are Preempted By ERISA.**

The Employee Retirement Income Security Act of 1974 was passed by Congress to eliminate the inconsistent state and local regulation of employee benefit plans. Section 514(a) of ERISA mandates ERISA's preemption of state laws by providing that ERISA "supersede[s] any and all State Laws insofar as they may now or hereinafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). ERISA defines the term "State Laws" broadly to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1).

The Supreme Court has repeatedly made it clear that the preemption provision of ERISA is extremely broad. See, e.g., Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987) ("the express pre-emption provisions of ERISA are deliberately expansive"); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 (1983) ("The breadth of [29 U.S.C. § 1144(a)'s] preemptive reach is apparent ...."). The Supreme Court has employed a similarly broad definition in determining whether a law "relates to" an employee welfare benefit plan. A state law "relates to 'an employee benefit plan ... if it has a connection with or reference to such a plan.'" Id. at 96-97.

Furthermore, the Supreme Court has "emphasized that the pre-emption clause is not limited to 'state laws specifically designed to affect employee benefit plans.'" Pilot Life Ins., 481 U.S. at 47-48; accord Shaw, 463 U.S. at 98 (preemption clause should not "be interpreted to

7

pre-empt only state laws dealing with the subject matters covered by ERISA -- reporting, disclosure, fiduciary responsibility, and the like."). Rather, any state law that impacts or has a connection to an employee benefit plan will be preempted and superseded by ERISA.

Not surprisingly, claims of breach of contract, promissory estoppel, or fraud based on the denial of benefits pursuant to the terms of an employee benefit plan, the administration of such a plan, or the representations of an administrator or fiduciary of such a plan are preempted under ERISA. This is the case whether the plaintiff is seeking payment of benefits or some form of damages. See, e.g., Pilot Life Ins., 481 U.S. at 44-48 (1987); Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).

In Metro. Life Ins., the Supreme Court held that ERISA preempts state common law contract and tort claims based upon the alleged improper denial or handling of benefit claims made under an employee benefit plan. In Pilot Life Ins., the Supreme Court held explicitly that state common law causes of action which are based on the alleged improper processing or denial of employee benefits under an insured employee benefit plan, including claims for fraudulent inducement, are preempted by ERISA.

Similarly, it is well-established in the Second Circuit that claims for fraud, misrepresentation, or fraudulent inducement in connection with the participation of a plaintiff in an ERISA plan fall directly under ERISA's preemption clause. See, e.g., Smith v. Dunham-Bush, Inc., 959 F.2d 6, 8-9 (2d Cir. 1992) (finding that ERISA preempted employee's common law claims for breach of oral promise to pay pension-related benefits, negligent misrepresentation, and inducement); Watson v. Consol. Edison of N.Y., 594 F. Supp. 2d 399, 409 (S.D.N.Y. 2009) (dismissing plaintiffs' fraudulent inducement claims because they "directly relate" to employee benefit plans and allege misconduct in the administration of those plans, and

8

therefore "fall directly under ERISA's express preemption clause."); DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543 (E.D.N.Y. 2003) (rejecting plaintiffs' request to amend complaint to assert a cause of action for common law fraud in connection with their participation in a voluntary retirement program, because "any common law fraud cause of action on these facts is preempted by ERISA."); Ullrich v. Linotype-Hell Co., 187 F. Supp. 2d 68, 73 (E.D.N.Y. 2002) (dismissing fraudulent inducement claim because it "relates directly to the benefits to which he alleges he is entitled under the [Severance] Plan"); Hamburger v. S. New Eng. Tel. Co., No. 3:97 cv 2392, 1998 U.S. Dist. LEXIS 6706, at *7 (D. Conn. May 6, 1998) (dismissing state law claim of negligent misrepresentation in connection with plaintiff's participation in an early retirement program because the claim "necessarily relies on the existence of an ERISA plan").

Here, Plaintiffs allege that they were improperly denied benefits under the Severance Plan – and that C&S therefore "breached" its agreement – because they did not receive the "Buyout Option" under the Severance Plan, and instead only received the Basic Severance Option. See Complaint ¶¶ 16-19. In addition, Plaintiffs allege that they were fraudulently induced to participate in the Severance Plan and sign the Release Agreements. See Complaint ¶¶ 24-28.

There can be no question that the Severance Plan is an employee welfare benefit plan under ERISA, 29 U.S.C. § 1002(1). It is well established that a formalized plan to provide severance to employees, particularly where the plan requires ongoing administration and discretion by the employer, constitutes an employee welfare benefit plan. See, e.g., Tischmann v. ITT/Sheraton Corp., 145 F.3d 561 (2d Cir. 1998); Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72 (2d Cir. 1996).

9

Here, the Severance Plan requires The Times to administer the plan and provide severance benefits – including ongoing contributions to a welfare fund – until 2012. Alloy Aff., Ex. 3. at 2-10. The Times must exercise discretion in determining eligibility for and participation in the Severance Plan, reviewing and deciding claims for benefits under the Plan, and tracking future employment by participants with The Times. Id. In addition, the Plan was created and established and is treated by C&S and The Times as an ERISA plan, was memorialized in a formal document that was distributed to all employees pursuant to ERISA, and C&S and The Times have undertaken reporting obligations pursuant to ERISA. Id.

Moreover, Plaintiffs' claims are inherently related to and reliant upon the provisions of the Severance Plan, and indeed, seek benefits to which they claim they are entitled under the Severance Plan. Thus, this action presents a clear example of state law claims that fall directly under ERISA's express preemption clause, and therefore Plaintiffs' claims must be dismissed as a matter of law. See Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004); Dunham-Bush, 959 F.2d at 9-10; Henry v. Dow Jones, No. 08-5316, 2009 U.S. Dist. LEXIS 6508, at *10-11 (S.D.N.Y. Jan. 28, 2009); Raff v. Travelers Ins. Co., No. 90-7673, 1996 U.S. Dist. LEXIS 3627, at *6-12 (S.D.N.Y. Mar. 26, 1996).

### B. Plaintiffs Cannot State A Claim Under ERISA As A Matter Of Law.

Even if Plaintiffs' claims had been properly brought pursuant to ERISA or this Court were to construe them as claims under ERISA, they still fail as a matter of law because Plaintiffs failed to exhaust their administrative remedies under the Severance Plan. See ERISA § 503, 29 U.S.C. § 1133; Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133-34 (2d Cir. 2001) (affirming dismissal of claims for failure to exhaust remedies under the plan's administrative process); Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993)

(reiterating "the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases"); Del Greco v. CVS Corp., 337 F. Supp. 2d 475, 484 (S.D.N.Y. 2004) ("[C]ourts have routinely held that an ERISA plaintiff must exhaust a plan's administrative procedures prior to filing suit for the recovery of benefits in federal court."), aff'd 164 F.App'x 75 (2d Cir. 2006); McNinch v. Goodyear Tire & Rubber Co., Inc., No. 03-3685, 2005 U.S. Dist. LEXIS 6351, at *12-14 (W.D.N.Y. Mar. 30, 2005) (dismissing plaintiff's claim for severance benefits because plaintiff did not follow the employer's requirement under the plan of making a written claim for benefits); Greifenberger v. Hartford Life Ins. Co., No. 03 Civ. 3238, 2003 U.S. Dist. LEXIS 22810, at *11-18 (S.D.N.Y. Dec. 16, 2003) (dismissing plaintiff's claim for benefits because plaintiff failed to follow the plan's appeal procedure before filing the action), aff'd 131 F.App'x 756 (2d Cir. 2005); Barnett v. IBM Corp., 885 F. Supp. 581, 589, 594 (S.D.N.Y. 1995) (dismissing claims for benefits where plaintiff made no effort to exhaust administrative remedies).

The exhaustion requirement is not a mere formality. The Second Circuit has recognized several significant purposes for requiring exhausting, including to: "'(1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.'" Kennedy, 989 F.2d at 594 (quoting Denton v. First Nat'l Bank, 765 F.2d 1295 (5th Cir.)).

Here, the Severance Plan contains an explicit "Claims Procedure" that must be followed and exhausted before bringing a legal action seeking payment of benefits under the Plan. First, the Severance Plan requires participants who feel that they have not been provided with all

benefits to which they are entitled under the Severance Plan to file a written claim with the Plan Administrator with respect to their rights to receive benefits from the Plan. Alloy Aff., Ex. 3 at 7. The Plan Administrator will then provide the participant with a written determination, including the reason for the determination and specific references to Plan provisions on which the determination is based. Id.

Second, the Severance Plan makes clear that if this first-level claim for benefits is denied, a participant has a right to request a review of the Plan Administrator's denial with the ERISA Management Committee of The New York Times Company:

> If your claim has been denied, or an adverse benefit determination has been made, you may request that the ERISA Management Committee of The New York Times Company (to whom the Plan Administrator has delegated this responsibility) review the denial. The request must be in writing and must be made within sixty (60) days after written notification of denial. In connection with this request, you (or your duly authorized representative) may (i) be provided, upon written request and free of charge, with reasonable access to (and copies of) all documents, records, and other information relevant to the claim; and (ii) submit to the ERISA Management Committee written comments, documents, records, and other information relating to the claim.

Alloy Aff., Ex. 3 at 8. The Plan further provides that "[t]hese procedures must be exhausted before a Participant may bring a legal action seeking payment of benefits." Id.

In their Complaint, Plaintiffs have not pled any facts indicating that they even attempted to *initiate* the claims review process, let alone that they exhausted all of the administrative procedures through appeal as outlined in the Severance Plan. Accordingly, even if Plaintiffs' state law claims for benefits were re-pled or re-constituted as claims under ERISA, their failure to exhaust all of the administrative procedures under the Severance Plan would mandate

dismissal as a matter of law.[11]

## II.

### PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT AND FRAUD ARE PREEMPTED BY AND FAIL TO STATE A CLAIM UNDER SECTION 301 OF THE LABOR MANAGEMENT RELATIONS ACT ("LMRA")

A.   **Plaintiffs' Claims Are Also Preempted By § 301 Of The LMRA.**

Plaintiffs' claims for breach of contract and fraud are also preempted by Section 301 of the Labor Managements Relations Act, 29 U.S.C. § 185(a), because they depend upon, and require interpretation of, the collectively-bargained Closing Agreement and side letter agreements entered into between C&S, The Times, and the NMDU.

Section 301 governs "claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987) (citing Int'l Bhd. of Elec. v. Hechler, 481 U.S. 851, 859 n.3 (1987)).  Section 301 is not merely jurisdictional; it also authorizes federal courts to create a "body of federal law for the enforcement of these collective bargaining agreements." Textile Workers Union v. Lincoln Mills of Alabama, 353 U.S. 448, 451 (1957); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962).

Any relationship created by collective bargaining agreements is therefore defined and governed by the application of federal "common law" under Section 301 that is grounded in national labor policy, and may not be subjected to inconsistent state law. See Bowen v. United States Postal Serv., 459 U.S. 212, 224-225 (1983). "[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions

---

[11] As discussed below, Plaintiffs also had an obligation to exhaust the collective bargaining agreement's grievance procedure under § 301 of the LMRA.

arise in the context of a suit for breach of contract or in a suit alleging liability in tort." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985).

State law claims that either directly or indirectly involve the interpretation or other analysis of collective bargaining agreements are preempted by federal law. See Local 174, Teamsters, 369 U.S. at 103-04. Section 301 preemption displaces state law claims entirely, subjecting them to dismissal. See, e.g., Allis-Chalmers, 471 U.S. at 213 (a cause of action is completely preempted where it is "intertwined with considerations of the terms and conditions of the labor contract"); Dougherty v. Am. Tel. & Tel. Co., 902 F.2d 201, 203 (2d Cir. 1990) (dismissing plaintiffs' common law fraud and negligent misrepresentation claims in connection with their layoff, where the layoff was conducted pursuant to a collective bargaining agreement).

Although the Complaint is vague, Plaintiffs appear to be challenging either C&S's or NMDU's determination of their seniority in that they allege they were among the 140 most senior NMDU-members to sign up for the Buyout Option, they were eligible for the Buyout Option and fulfilled all requirements in order to receive the buyout (i.e., timely submission of the Election Form and Release Agreements), but they did not actually receive the buyout and instead received the Basic Severance Option. Complaint ¶ 11-12. Resolution of this issue and the determination of Plaintiffs' and other employees' seniority necessarily involves the interpretation and analysis of the Closing Agreement and related side letter agreements, which specifically define "seniority" for purposes of the Closing Agreement and Severance Plan. Alloy Aff., Ex. 2 at 11 (unnumbered).

Paragraph 13 of the Complaint appears to be challenging whether employees who initially opted to become employed with The Times could revoke that decision and qualify for the Buyout Option, another issue that is specifically addressed in the language of the Closing

Agreement. Complaint ¶ 13, Alloy Aff., Ex. 2 at 1-3. In addition, Plaintiffs allege that The Times, C&S, and the NMDU misrepresented their financial viability and ability to timely pay out severance pursuant to the Closing Agreement and Severance Plan. Indeed, Plaintiffs allege that "throughout the discussions leading to the execution of the Agreement" the Defendants "made various [false] oral representations" about their financial viability, that Plaintiffs relied on these statements in electing to participate in the Severance Plan, and that defendants never intended to fulfill their obligations pursuant to the Closing Agreement and Severance Plan. Complaint ¶ 24-27. Thus, the facts surrounding the negotiation and announcement of the Closing Agreement and Severance Plan and whether these documents accurately reflect the parties' intentions require interpretation and application of the Closing Agreement and Severance Plan.

Accordingly, plaintiffs' common law claims for breach of contract and fraud are also barred under Section 301 and must be dismissed for this additional reason.

### B. Plaintiffs Cannot State A Claim Under § 301 Of The LMRA As A Matter of Law.

Even if the Plaintiffs' claims were re-pled or this Court interpreted them as claims under Section 301, the claims would fail as a matter of law because Plaintiffs have failed to exhaust the grievance and arbitration procedures provided in the Closing Agreement. King v. N.Y. Tel. Co., 785 F.2d 31, 33 (2d Cir. 1986) (citing Republic Steel Corp. v. Maddox, 379 U.S. 650, 652-53 (1965)).

Indeed, courts in this Circuit routinely dismiss claims either challenging or requiring interpretation of a collectively-bargained agreement where the plaintiff has failed to exhaust the appropriate grievance and arbitration provisions of the agreement in the absence of a claim that the union breached its duty of fair representation. See, e.g., Vera v. Saks & Co., 335 F.3d 109 (2d Cir. 2003) (affirming summary judgment to employer because plaintiff failed to exhaust his

15

remedies under the collective bargaining agreement); Dougherty, 902 F.2d at 204 (dismissing state law claims for fraudulent inducement in connection with a workforce reduction where plaintiff failed to exhaust the collective bargaining agreement's grievance procedures); Giron v. Balcor Co., No. 97-5065, 1998 U.S. Dist. LEXIS 7803 (S.D.N.Y. May 27, 1998) (dismissing claims for severance pay pursuant to collectively-bargained agreement where plaintiff made no attempt to exhaust contractual grievance and arbitration procedures); Lopez v. Time Inc., No. 93-5330, 1994 U.S. Dist. LEXIS 2802 (S.D.N.Y. Mar. 11, 1994) (dismissing claims for breach of collective bargaining agreement in connection with a severance program because plaintiff failed to exhaust the agreement's grievance and arbitration procedure and there was no allegation that the union breached its duty of fair representation).

Here, the Closing Agreement contains a grievance and arbitration provision which clearly states that: "[a]ll grievances, differences and disputes arising out of the interpretation or application of this Agreement shall be resolved in arbitration before the Impartial Chair of the NMDU/Times collective bargaining agreement (currently Arbitrator Martin Scheinman), or, if the Impartial Chair is unavailable or unwilling to serve, before an arbitrator selected by the parties pursuant to the Labor Arbitration Rules of the American Arbitration Association." Alloy Aff., Ex. 2 at 8.

Plaintiffs do not – and cannot – allege that they made any attempt to exhaust the grievance and arbitration procedures established by the Closing Agreement. In addition, Plaintiffs do not allege that the NMDU breached its duty of fair representation. Accordingly, any attempt by the Plaintiffs to challenge under Section 301 of the LMRA either (i) C&S's determination and application of seniority in connection with the Buyout Option and/or (ii)

16

C&S's and The Times' communications in connection with the Closing Agreement and various severance options under the Agreement, should be dismissed as a matter of law.

## III.

**PLAINTIFFS HAVE EXPRESSLY WAIVED AND RELEASED THEIR FRAUD CLAIM**

Even if Plaintiffs' fraud claim is not preempted by ERISA and/or Section 301 of the LMRA, Plaintiffs may not maintain a claim for fraud in connection with their decisions to participate in the Severance Plan because they have already knowingly and voluntarily waived and released all such claims. Under New York law, "[i]t is firmly established that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." Skluth v. United Merchants & Mfrs., Inc., 163 A.D.2d 104, 106, 559 N.Y.S.2d 280, 281 (1st Dep't 1990) (citing Appel v. Ford Motor Co., 111 A.D.2d 731, 732, 490 N.Y.S.2d 228, 229 (2nd Dep't 1985)).

By signing and returning their Release Agreements in exchange for severance payments, which they received, the Plaintiffs expressly agreed to release C&S, The Times, and the NMDU from "all claims, whether known or unknown, which [Plaintiffs] ever had, now have, or may have against [Defendants] arising out of [Plaintiffs'] employment with C&S and resignation from employment under the Plan." Alloy Aff., Exs. 6 and 8 at 3. The Release Agreement explicitly states that it covers "any and all claims arising out of execution of this Release Agreement, including, without limitation, Employee's election to participate in the Severance Plan (but excluding claims to enforce this Agreement)." Id. (emphasis added).

In addition, the Release Agreement clearly sets forth – in bold – each Plaintiff's agreement that they have carefully read the Agreement, had an opportunity to fully consider its terms for at least forty-five days, were advised to consult with an attorney and had a reasonable

17

opportunity to do so, fully understand the significance of all the terms and conditions of the Agreement, and signed the Agreement voluntarily and of their own free will. Id. at 2-3. Because Plaintiffs have not pled any new facts allegedly acquired after signing the Release Agreements so as to vitiate their knowing and voluntary waiver of claims, their release of all claims, including any claims for fraud, must be enforced.

In addition, by signing and returning the Release Agreements, Plaintiffs explicitly agreed and acknowledged that "This Release Agreement constitutes the complete understanding between the parties and may not be changed orally… neither C&S, nor any representative of C&S has made any representation or promises to Employee other than as expressly set forth herein. No other promises or agreements shall be binding unless in writing and signed after the Separation Date by the parties to be bound thereby." Id. at 5. Therefore, Plaintiffs' allegations that they relied on "various [false] oral representations" by the Defendants is explicitly contradicted by their express acknowledgment that no other representations or promises were made to them apart from those contained in the Release Agreement, and these alleged representations cannot form the basis of an actionable claim for fraud.

IV.

**PLAINTIFFS' FRAUD CLAIM FAILS AS A MATTER OF LAW BECAUSE THEY FAILED TO PLEAD THE FRAUD WITH PARTICULARITY**

In addition, even if Plaintiffs' fraud claim was not properly waived in the Release Agreements, it must nevertheless be dismissed as a matter of law because Plaintiffs have failed to plead any of the specific facts or circumstances allegedly constituting the fraud, as required under Rule 9(b) of the Fed. R. Civ. P. For example, Plaintiffs have not identified who made the "various oral representations" alleged in Paragraphs 24-27 of the Complaint, what precisely was represented to Plaintiffs, or when and where the representations were made. It is well-

established that vague and conclusory allegations of fraud – like those contained in the Complaint – are insufficient as a matter of law to make out a viable cause of action. See Olsen v. Pratt & Whitney Aircraft, 136 F.3d 273, 275 (2d Cir. 1998) ("We have held that 'when a complaint charges fraud, it must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent.'") (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)).[12]

## CONCLUSION

For the reasons set forth above, The Times' and C&S's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be granted and the Complaint dismissed in its entirety with prejudice.

Dated: New York, New York
July 30, 2009

Respectfully submitted,

PROSKAUER ROSE LLP

By: _/s/ Josh Alloy_

Neil H. Abramson (NA-0889)
Joshua F. Alloy (JA-4372)
1585 Broadway
New York, New York 10036
(212) 969-3000
*Attorneys for Defendants*
*The New York Times Co. and*
*City & Suburban Delivery Systems*

---

[12] In addition, Plaintiffs' fraud claim must be dismissed because it is not sufficiently distinct from their breach of contract claim – they are simply re-characterizing their challenge to C&S and The Times' contractual promise to pay prospective severance benefits pursuant to the Severance Plan and Closing Agreement. See Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183-84 (2d Cir. 2007).

19